Case No. 23-1887, Peter Lyoya v. Christopher Schurr, et al., oral argument not to exceed 15 minutes per side. Ms. Henderson, you may proceed for the appellants. Good morning. May it please the court, Callie Henderson on behalf of appellant Christopher Schurr, who is seated to my left. For the first time, this circuit is being asked to address whether deadly force is reasonable when an officer's taser is stripped from him by a suspect who has grappled for that weapon for more than a minute, where it is undisputed that that weapon is still operable and within the immediate control of the suspect, who remains in close physical proximity to the officer. Is it reasonable for that officer to believe that the suspect, who is fighting and winning to turn towards the officer, is capable of inflicting serious injury or death when this circuit has repeatedly told officers that they must be aware of the dangers that taser can inflict when they use it and the injuries that it can cause, injuries that he can equally suffer? The case law suggests that deadly force is reasonable. And what the case law doesn't say should make it very easy for this court to grant Officer Schurr qualified immunity. Now, we have presented two arguments to this court as to why Officer Schurr is entitled to qualified immunity. And that is under both prongs of the analysis. Now, under the first prong, we urge this court to rule that using deadly force was not a constitutional violation under these circumstances. And under the second prong, the law wasn't clearly established. And so when we look back to the first prong, there aren't any cases that directly address how an officer can respond when his weapon, his taser, is stripped from him. What we do know is how officers- Counsel, are you advocating then a position that if a suspect has taken the taser from the officer, and that justifies deadly force in all circumstances? No, Your Honor. And I don't think, I think the Supreme Court has strictly addressed that such hard and fast rules don't fit well within the confines of the Fourth Amendment. What I'm arguing is that in this circumstance, given the struggle that we've had, the length of that struggle, the fact that Officer Schreuer was on his own, the close proximity of the two individuals, I think these circumstances dictate that deadly force was the only option under those circumstances, that it was reasonable. What's your best case to show that this should be qualified immunity? Is there one good case like this? I don't believe there is one good case. And that's exactly my point as to the second prong. But what I think are some strong cases in our favor as to some of the factors that the court can analyze would be the Mullins case, where the firearm is thrown moments before, such that the officer wasn't aware that he no longer possessed the weapon. In this circumstance, Officer Schreuer is not aware, and I would posit to this court that whether Laoya had the taser in his hands or not is not the deciding factor in this case. I believe he did. I believe that's very clear on the video. But what we know is he had grappled. He had stripped the taser away from Officer Schreuer. Officer Schreuer no longer had that taser in his hands. We can see his hands. He doesn't have it. We know the taser is under Laoya. We know Laoya is turning towards him, such that it's reasonable for the officer to perceive that Laoya does have that weapon and his response to it, given the proximity. And I think if you look also to the Thomas case, where the officer arrives on scene, he has very little time to assess what's happening. And there's an individual running at him with a rifle. It's not pointed at him. When he originally sees him, he's about 40 feet away. And this circuit said that his response with deadly force was appropriate under those circumstances. Now, in Mullins and Thomas, were those motion-to-dismiss cases or summary judgment cases? I believe they were summary judgment cases. And I think one of the big changes that I know has been impacting these cases is the advent of all the videos that we now have, such that, while I'm not saying that a Rule 12 motion before couldn't have been decided, but I think it's definitely much easier now, especially when we look at the changes in the Iqbal standard that requires sufficient factual information. And here, we're looking at the videos of what happened. But our case law says that the video has to blatantly contradict or utterly discredit the allegations of the complaint. So that's the standard you have to meet in reviewing the videos. What about the videos blatantly contradicts or utterly discredits the allegations of the complaint that Leola was not resisting? Well, I think the allegations say that he's passively resisting and that he's unarmed. And I think we know- But I think they're saying he wasn't doing anything towards the officer. He was just trying to prevent the taser from hitting him. There's no allegation that he actually held the taser in his hand. Right, and I think there's, so there's a couple points I would raise in response to that. And I think if we look to this circuit's case law on what is passive resistance or active resistance, we know Leola was actively resisting. He was doing more than verbally resisting. He was physically resisting the officer. He was using force against that officer. So to say passively resisting under this circuit's precedent, that's very easy to set aside when we look at the video and we see what's going on. And then to say that he's only deflecting the taser, what we know, that's a subjective interpretation of that video. And what we have to look at is what the officer, a reasonable officer, would perceive. I don't even care what Officer Scherr perceived under those exact moments. What the Fourth Amendment is concerned with is what is reasonable for an objective officer to perceive in response to a suspect grabbing his taser, pushing it away, and what we know from the video is that he doesn't just push it away. He grabs onto that taser. He holds onto that. We see that in the video. That's indisputable, that he's holding onto that taser for more than a minute. He's got his hands on it. Officer Scherr commands him multiple times to release the taser, to let go of the taser, and we get to the point when he's lost it that he's saying, drop the taser, and those commands are still ignored. I think there's 29 commands overall to- When the officer fired his handgun into the head of the defendant, or not the defendant, but the decedent, didn't he have control of him then and couldn't it have been a whole lot easier to control him than trying to shoot him in the back of the head or the head someplace? Your Honor, I recognize how that appears, and I just realized as I looked at the clock that I forgot to reserve my three minutes for rebuttal, so respectfully, I'd like to reserve three minutes now for that rebuttal. You may. But to address your question, I think the precedent is very clear that deadly force is deadly force, right? So whether it's to the back of the head, to the chest, that's irrelevant. He used deadly force. And in this situation, when he used it, he was very much not in control of Mr. Laoya. He was still giving commands that were being ignored. And if we watch those moments, that segment, which is where one of the areas I think the district court really erred to confine its analysis to that immediate segment when deadly force is used, we see Officer Scherr's feet, both of them are off the ground. We hear his breathing. He is out of breath. He has been grappling for at least three minutes at this point with Mr. Laoya, and such that he doesn't have control. Patrick Laoya has already pushed his way up once. Those are the objective facts that the officer knows at that time, that he is showing this unusual strength to be able to resist all of the officer's efforts, knee strikes, punches. None of these have allowed him to gain control. These are the objective facts. He's already tried these other measures. And we see in the video, it is plain, that the individual is pushing up off the ground, able to turn, just like he did previously that we saw in the video. Is there anything in the video indicating that Officer Scherr was trying to get handcuffs out for this, suspect? No, Your Honor. I'm not aware that he was trying to get his handcuffs off, and I see nothing in the video. Nor do I believe that would have been likely under this scenario, because he hadn't even gained control of him in order to safely place the handcuffs on him at that point. He's still dealing with a suspect who refused to submit, submit to any of his commands. And at that point, he had two other individuals that were now out there. One that was closing in on him from behind, the passenger in that vehicle, who he still did not know who either of these individuals were. He knew that there was a plate on that car that didn't belong on it, that the driver refused to identify himself, so much so that he was trying to run, refusing every command, willing to grab his taser. These are clear efforts being made to control the suspect that he is very much resisting. And he has tried multiple different options of force to gain control of that situation, and he was not able to at that time. Such that he's responding, and he is now facing the threat of his taser being turned on him. And that taser, well yeah, we will accept for purposes of this motion right now, as plaintiff has pled, that it's only capable of drive stunning. But this circuit has recognized that even that, in that mode, it is still a dangerous weapon, and we're looking for serious injury or death. That taser, given especially the positioning of how they're positioned at that time, officer sure is not just within the close proximity of four to six feet, 20 feet, like some of the cases where deadly force has been authorized for knives or rakes, has authorized. He is right on top of him. It would be extremely easy for that taser in drive stun to hit his head, which this circuit has recognized is one of the most dangerous spots for a taser. That's what taser itself warns of, the serious injury that a taser to the neck, the head, especially the eyes can cause. And so that is an injury that I do not believe the fourth amendment requires officer sure to risk under these circumstances, when he has tried every other method to gain control of the suspect. At what point, when the officer pulled his weapon out to shoot him, at what point was the decedent in control of this taser? Did he have it in his hand, or was it thrown off to the side, or what was that? Based on the video, Your Honor, and I see my time is about to expire, so I'll answer quickly. Based on the video, I believe it's clear that Loyola had it in his hand, because you can see the yellow of the taser and Loyola's hand on it. But even if it wasn't, I believe it's still very clear that the taser's under Loyola, he had just grappled it out of Sher's hands for more than a minute, such that it's reasonable for Sher to assume that Loyola still has it in his hand, and that he can turn on him and use it on him. Thank you. Thank you. Good morning, Your Honors. Christopher Desmond from Johnson Law on behalf of the plaintiff, the estate of Patrick Loyola. Your Honors, I want to start with the question that Judge Bush posed, which was this idea about the importance of whether or not we're at a motion for summary judgment stage or a motion to dismiss stage, because I think that pervades this entire argument today. Counsel was just asked what her best case was to show that this was an excessive use of force and that Officer Sher is entitled to qualified immunity, and the response was the Mullins case and the Thomas case. Now, both of those cases are motions for summary judgment, as I point out in my brief, and they're not the only two. There are 12 different motions for summary judgment that are relied on fairly heavily by the defense at the motion to dismiss stage. Now, we know, and this is from the CAHOO case, which I've cited to in my brief, we know that qualified immunity is disfavored at the motion to dismiss stage, and defense counsel tries to overcome that today and in their briefing by referencing the video and the fact that we have video evidence. But Judge Bush, as you pointed out, first of all, video evidence, unless it wholly contradicts the plaintiff's account, it can't serve as the basis for granting a motion to dismiss. But I would submit that in addition to that point, Judge Bush, this circuit's case law also makes it clear that if the video is not complete, it can't be relied on at the motion to dismiss stage prior to discovery. We submitted to this court, and I reviewed it last night, what we refer to as our synchronized video. And it's a video that shows three different camera angles at the same time. It's the body cam, it's the dash cam, and it's the front seat passenger in Patrick's car. I'm sorry, you submitted something last night? No, no, I reviewed it last night. This is a video that we had previously submitted to the court with our briefing. And when you watch that video, we see that there is a roughly 12 to 15 second portion of the video where you cannot see what's going on. The passenger's camera is essentially pointed down at the ground, Officer Scherr's camera has become dislodged, and the dash cam can't pick up what's happening. In addition to that, there's a fourth camera that's also capturing these events, which is the nest or ring doorbell camera that's on a house across the street. That also can't pick up with any detail what's happening during that 10 to 15 second span. So under this court's precedent in the Gadawa case, which we cite to in our brief, this court can't rely on that video. But your honors, I think there's more than that. Even if this court had full and complete video evidence, which it certainly does not, we don't know enough about the taser and the stun gun at issue in this case. And what defense counsel just said is she started by arguing about all of this court's case law about tasers and how dangerous tasers can be, and they can be dangerous instrumentalities when used by an officer. But there's a concession that this was not a taser that they were wrestling over at the time they were wrestling over it. By the time the shot is fired, this is at most a stun gun. What we don't have in this record, and what we've argued in our brief, is there is no indication that Patrick Leovia had any knowledge of how to use a stun gun. Is this, you're saying this is not a taser here? It is not a taser, your honor. And what we've explained in our brief is that this taser's functionality, it is equipped with two sets of taser prongs. You can fire the taser twice. Once the taser has fired twice, it is no longer functional as a taser. It can only be used as a stun gun. A stun gun, instead of shooting something into somebody from a distance, it only is effective when you're making direct contact with someone's body. It has less of an incapacitating effect than a taser has. It has less of an effect on the human body than a taser has. And it's also easier to get away from, because simply stepping back from that device so that it's not making contact with your body anymore ceases the electrical current from flowing. So it functions- Let's assume that this stun gun could not be used. It was not available. Why isn't it enough that it appears from the video they are wrestling with each other? Why isn't it enough for an officer to defend himself with a gun if he's got a defendant that's clearly not being subdued and is continuing to wrestle with the officer, even after repeated commands? So, first of all, Your Honor, I would take issue with characterizing it as the two individuals are wrestling. I think that when I watch this video and what I see and what our- Well, he's having trouble getting him down to the ground. Well, he certainly is. No, and I don't disagree with that. I don't disagree over the idea that there's a struggle. There's no way I can deny that. That's clear in the video. But what's also clear in the video, and what's clear, you know, and this is on page 29 of my brief and to page 30 of my brief. I go through and I outline, and this is all from citations from defendant's brief, all the acts of aggression from Officer Scherr toward Patrick Leoia that preceded them ending up on the ground. And defense counsel talked about them as well when she was up here. And I think it's just because we see these facts as being very different. She sees Officer Scherr's efforts of punching Patrick in the head, hitting him with two knee strikes, attempting a third knee strike, tackling him twice, utilizing his taser and firing at him twice. She views all of that as efforts to use non-lethal force. I view that as efforts to use aggression toward an individual who had not been aggressive toward Officer Scherr at all. My client began to walk away from the car in confusion when the stop started. And that's when Officer Scherr grabs him with both hands. When he grabs him, my client tries to remove himself by spinning away. There's no blow toward Officer Scherr. There are no words of aggression. He is simply walking away from the officer at all times. That's when the knee strikes happen. That's when the punches happen. So yes, Patrick is definitely trying to get away from this scenario. But I don't think that there's any indication in this record. And what we know, I mean, we have Garner and Graham, which I think just flat out defeats this motion and supports what the district court did. But what we also have is, in addition to that, this court's case law talking about how you have to be concerned about the totality of the circumstances. Everything. I know we have the segmented approach in this circuit. And I know that gets talked about a lot. So what is your theory going to be if this case goes forward at that last encounter, obviously before he shoots him, what was the officer supposed to have done? What would you say the officer should have done in that scenario? Our experts, and I know this isn't part of the record right now, but what this record is going to clearly show is that at the moment of the shot, if we want to limit ourselves to that segment, Officer Scherr is in a physically dominant position to Patrick Leoya. He has his feet planted on the ground. He has his non-dominant arm on Patrick's body, and he's grabbing his gun with his right hand. What the evidence is going to show when this case goes forward is that Officer Scherr, all the training indicated that at that moment, he's supposed to create distance. Take one to two steps back from my client. And now in that situation, Officer Scherr has a handgun drawn and ready. He can warn my client about the presence of the handgun, by the way, which never happened in this case and which Garner requires. And it's also why I take issue, by the way, with defense counsel. So your theory is going to be that he should have gotten off of the suspect and stepped back? He should have gotten off of the suspect, and yeah, if we're gonna get to that point where they're on the ground and he's going to engage in this physical conflict over what's been described as mismatched license plate taps, right? Over a non-serious crime. So he would pull the gun out, he could pull the gun out in that scenario and then wait to see if the suspect picks up the taser and comes at him and then at that point could shoot him? Presumably, if the suspect picks up the taser. It's a different analysis. I'm not gonna concede he could shoot him in that instance because I think this court does have a body of case law that talks about essentially zones of danger when it comes to different types of weapons, right? Stabbing weapons are different than guns, are different than tasers, are different than stun guns. And so I think that's gonna come down to what discovery shows regarding the knowledge of a reasonable officer, whether that's Officer Schur or someone else, the knowledge of a reasonable officer regarding what that weapon could have done in that moment and what kind of threat it posed. And the defense is aware of this, your honors, which is why they resort by the end of their brief, they say, well, the ubiquitous blunt object is just as dangerous as a knife or a gun because they know that by the time the shooting happens here that's at most what Patrick has is a blunt object and a blunt object that he's never exhibited any willingness to use as a weapon. He's never done anything. You know, it's interesting to hear this idea that Officer Schur surrendered the taser, had given up the taser so that he could move toward his gun. There's this discussion about how, well, we think that Patrick grabbed the taser. I don't see that in the video. I don't see that in the video at all. But what I would say is, what does that do for them if that's true that Patrick grabbed the taser? Because we know he never used it. We know he didn't turn around and try to use it aggressively toward the officer. If he did have the taser in his hand, which I don't think he did, I think all it does is support our contention that he was trying to protect himself from an officer that was acting aggressively toward him when he's in a state of confusion and he doesn't know what's going on. We have a language divide in this case, which is evident from the beginning of the video. There is every reason in the world to believe that Patrick Leoya simply wanted to escape. And I don't see any evidence in this record. And certainly, certainly, no allegations in our complaint, which is what we're supposed to be talking about today, no allegations in our complaint that Patrick intended to injure Officer Schur or ever gave an indication that he was willing or able to injure Officer Schur or any other member of the public. Because that is one other point that I'd like to make, that Nest video cam that's available to this court, it shows a pretty wide section of this street. We can see what's happening. Were there other officers around this event? There were no other officers around, Judge Siler, because Officer Schur never called for backup, which is another thing that should have happened here. And there's a case that defense counsel cites, I believe it's the Ashford case, but I discussed this in my brief. And the Ashford case says that one of the things that this court should do is consider alternative options that were available to an officer who's accused of using excessive force. Could he have stepped away? Could he have created distance? Could he have called for backup? And by the way, the entire time this is happening, there's a front seat passenger sitting in this car, someone who hasn't been pulled out of the car, someone who hasn't been checked for weapons, someone who could drive away at any moment. There are a variety of policy violations that occurred here, and all of them speak to the reasonableness of the conduct that was used. And without having discovery, that's not going to be able to be fleshed out for a finder of fact. Along those lines, there's a case that I cite to in my brief, which is the Carmita Lewis case. It's the estate of Dominique Lewis against the charter township of Flint. And it was my case, and I've linked a video inside of my brief for this court that shows the shooting that occurred in this case. In that case, it was very similar. There was a shooting that was captured on camera, and I would argue it was captured more on camera than this was. There's not a 10 to 15 black spot in that video like there is in this one. And the defense immediately moved for a dismissal. And it came to this court, and this court said, no, discovery is necessary and proper because we don't know what the mindset of the officer was when he fired his shot and why he fired his shot. It went all the way to the US Supreme Court with us fighting this case and with the defense saying, there's no reason for this case to go forward. We have it on video. The US Supreme Court denied cert. We took the deposition of the officer, and in his first deposition, he immediately conceded, I didn't feel like I was at risk of being shot. The case settled very quickly after that. And the entire time, it was portrayed as the video tells the whole story. Videos don't always tell the whole story, especially when they can't tell us things about how can a stun gun be used? What could Patrick do? What does Officer Schur know? None of that is captured in the video, nor are the totality of the events captured in the video because of the 10 to 15 seconds of unavailability. Your Honor, I think it's clear that we have a use of excessive force here. When you apply Garner, when you apply Graham, and Judge Bush, this goes to what you were asking about, well, what's an officer supposed to do? The other thing an officer can do is let Patrick go. And I know that that can sound weird to law enforcement sometimes, but what Garner and Graham specifically say, and it's quoted in my brief, and it's quoted in the district court opinion, is that it's not better that felony suspects die rather than escape. And that's particularly true when the felony suspect in question isn't a serious felon. He's not a felon, and actually, he's not even a felony suspect at that point. He's a misdemeanor suspect at that point. So our body of case law doesn't even really speak to people like Patrick. But it still says, if it's a felony suspect, it's better to let him go than to shoot him dead if he doesn't pose a threat to someone else in the community, which is what all those cases say. And they talk about, by the way, when they talk about how clear it is whether someone poses a threat to someone, they actually give a standard. They say probable cause. An officer, not just reasonable suspicion, an officer has to have probable cause that Patrick was going to inflict serious harm on a member of the public or on himself. I don't see that in this video whatsoever. So I don't think that there's any question that this was a constitutional violation. And I also don't think that there's any question that it was clearly established at the time of these events. This is oftentimes the fight in this court on 1983 cases, is this notion of clearly established and how specific of a case can you get? Well, we have Garner, which is on point. And we have this court, which I've cited to in my brief a number of opinions. I think it's the King opinion, the Jacobs opinion, the Mullins opinion, where this court recognizes the Garner standard and recognizes that you have a right to not be shot and not be victimized by lethal force if you don't pose a physical threat of serious harm or death to someone. So that's clearly established. But there's a case that makes it even more clear, which is the Smith v. Cupp case. And this is cited in my brief. And it's one of those rare instances where you have a quote that is just completely on point to a factual scenario. Because it says, it is clearly established constitutional law that you cannot shoot a fleeing, nonviolent felon in the back of the head to prevent his escape. That's what happened here. He was not fleeing, though. He was immediately underneath him. And they were wrestling. Well, he was immediately underneath him because his I guess what's troubling me a bit is the cases where we talk about, generally with use of force, you have the suspect who's separate in space from the officer who probably has a deadly weapon or does not. And we kind of decide it based on that. Here you've got people intermeshed with each other. And it looks like, from the video to me, it's going to be hard for that officer to get up without some risk to him that Leola will either grab the taser or even reach over and grab the guy's gun. Is that not a risk also, that he could actually grab the officer's gun? I don't think it is, Your Honor. I don't think it is. But what I would say is, to the degree that it is, that's something that's not in this record. That is something that is absolutely discovery dependent at this stage. I guess it depends on how much you can see in the video from that. Right, it does. And one thing that I'd like to say to this court, and that I try to say a lot of times when I'm in dispositive motion context, I didn't move for summary judgment in this case. I know we're at a motion to dismiss stage. But you understand what I'm saying. I'm not sitting here saying that, as a matter of law right now, this court can say that we win. I'm saying that this court has to let this case go forward and proceed to discovery. Because there's so much here. You could be right, Judge Bush. They could get an expert who says, no, if he had taken a step back, maybe Patrick grabs the gun. Maybe their expert's going to say that. I have two experts right now who say the complete opposite of that. Two highly trained experts who say, there is no question that you create distance and step away. That's what your training requires. Patrick is barefoot, on the ground, untrained. Whether this was known to Officer Scher at the time or not, I don't know. He was intoxicated. The autopsy shows that he had a blood alcohol content. This is not an individual who is in a position to fight with an armed, trained officer who is ready to go at the start of his work day. So Judge Bush, I would respectfully submit this is a case that has to proceed forward to discovery, regardless of those concerns that you just indicated. Thank you. Thank you very much. I have a few points that I'd like to address specifically. But I'd also refer the court to our reply brief, because I think it addressed, very specifically, a lot of the misrepresentations that were just made to this court. And to look at the video, specifically, like they claim that there was no call for backup. That's absolutely not true. He immediately radios in that he's got one running, and you hear that he needs additional units. So whether he said, give me backup, he didn't say those specific words. Additional units were called. He's communicating. We hear him communicating the whole time, and while he's running, as soon as Larry runs. So I refer the court to look at our reply brief on these issues. But the one thing I want to address, specifically, is whether we can decide this case right now. And the fact that it's a motion to dismiss, I believe, is irrelevant. Because the question that we have posed is, what did the law require? As of April of 2022, what were the directions from the Supreme Court, from this court? These courts decide what the law is. The facts are not going to change what the law permitted Officer Scherr to do under these circumstances. Specifically, when we're dealing with qualified immunity, that's what matters. That's what these officers know. So whether some expert's going to issue some opinion, which we all know always happens in every case, that's not going to change what the law had already instructed officers as to the appropriateness of their response. And that's what we're asking for that direction from this court, to say, no, looking at the video, and we know we can see a lot in these videos, we have those key moments. Yeah, did we lose a little bit, those 10 seconds there, of wrestling? We see them on the ring cam, though. We might not have them on the cell phone, but we see them on the ring. But most importantly, we see those moments of struggle that led up to the deadly force. We have all of those seconds. We have the deadly force captured. We know what was going on. We know everything that led up to that, such that I think there's sufficient information based on the pleadings and the video for this court to tell us, what did the law require of officers when their tasers had been stripped and they were facing the danger of that person turning on them that I know the court has already recognized? And did it require him? I've never seen an opinion from this court, I believe that's been wholly misrepresented, that said, an officer cannot use force to detain someone. He can't be aggressive to detain him when the person is not following his commands. That is an officer's right under the Fourth Amendment, to use reasonable force, such that his acts of aggression were appropriate. They weren't acts of aggression. They were methods that he was permitted to use to control the suspect. Patrick Laoya did not have the right to resist under any circumstances. So the fact that we want to say, oh, he's just running away, he was running away from a uniformed officer. A uniformed officer who'd used many methods to make it very clear that he was being detained and he needed to stop resisting and he refused. And he then put the officer at risk that the Fourth Amendment has never asked an officer to take with his own body and life. Thank you. Thank you, counsel. And we'll take the matter under submission.